STORER COMMUNICATIONS, INCOR-
PORATED, an Ohio corporation, Dade
Cable Television, Inc., a Florida corpo-
ration, Storer Cable TV of Florida, Inc.,
a Florida corporation, and Hollywood
Cablevision, a Florida joint venture,
Plaintiffs,

v.

Ron MOGEL and Robert E.
McDonough, Defendants.

Civ. A. No. 85–6822–Civ–EPS.

United States District Court,
S.D. Florida,
Broward Division.

Nov. 26, 1985.

Terry Bienstock, Frates, Bienstock &
Sheehe, Miami, Fla., for plaintiffs.

Stuart Stein, Fort Lauderdale, Fla., for
defendants.

## ORDER GRANTING
## PRELIMINARY INJUNCTION

SPELLMAN, District Judge.

THIS CAUSE came to be heard for an evidentiary hearing on November 21, 1985, on plaintiffs', STORER COMMUNICATIONS, INCORPORATED ("STORER"), DADE CABLE TELEVISION, INC., STORER CABLE TV OF FLORIDA, INC. and HOLLYWOOD CABLEVISION ("STORER CABLE"), Motion for a Preliminary Injunction pursuant to Rule 65, Federal Rules of Civil Procedure.

Plaintiffs seek to enjoin the defendants from the continued sale, distribution, provision of instructions for installation and actual installation, in Broward and Dade Counties and elsewhere, of devices and equipment designed, adapted, used and/or intended to be used for, or capable of, the unauthorized interception and reception of plaintiffs' cable television services (hereinafter "unauthorized cable television equipment"). The action arises under the federal Communications Act of 1934, 47 U.S.C. § 553; the federal R.I.C.O. Act, 18 U.S.C. § 1962; the Florida R.I.C.O. Act, § 895.03, Florida Statutes; the Florida Trespass and Larceny of Cable Television Service Statute, § 812.14, Florida Statutes; Florida Theft Statute, § 812.014(1), Florida Statutes; the Florida Unfair and Deceptive Acts or Practices Statute, § 501.204, Florida Statutes; and common law remedies for conversion and unfair competition. Although only the claims for relief under 47 U.S.C. § 553 and Florida Statutes, Section 812.14 were argued at the hearing, plaintiffs fully briefed the claim for relief under Florida Statutes, Section 812.014(1).

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338 over the federal claims and pendent jurisdiction over the state law claims.

The issues raised have been briefed and this Court has reviewed evidence, heard testimony of witnesses and argument of counsel. This Court concludes that the plaintiffs are entitled to preliminary injunctive relief, and hereby makes and enters the following Findings of Facts and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Storer Communications, Incorporated ("Storer"), is an Ohio corporation authorized to do business in Florida. STORER is engaged in the distribution of cable television. Cable television, as used herein, refers to television programming transmitted via coaxial cables, for which the receiver pays a subscription fee.

2. Plaintiffs, Dade Cable Television, Inc., Storer Cable TV of Florida, Inc., corporations duly organized under the laws of the State of Florida, and Hollywood Cablevision, a Florida joint venture between Storer Cable TV of Florida, Inc. and Hollywood Cable TV, Inc., own and operate cable television systems in Dade and Broward Counties, Florida, where the instant claims arose. Hereinafter, Dade Cable Television, Inc., Storer Cable TV of Florida, Inc., and Hollywood Cablevision will be referred to collectively as "Storer Cable."

3. Defendant, Ron Mogel, is an individual residing in Fort Lauderdale, Florida.

4. Defendant, Robert E. McDonough, is an individual residing in Hollywood, Florida.

5. Defendants are doing business within Broward and Dade Counties.

6. Storer is engaged in the business of acquiring exhibition rights to programming for distribution via its cable television system. Storer pays the originators of the programming for such exhibition rights. Storer's cable television programming is supplied to customers in Dade and Broward Counties through its wholly owned Storer Cable subsidiaries. Under the terms of the authorization granted to plaintiffs by the localities in the Dade and Broward County areas, the plaintiffs are obligated to pay a portion of subscription fees to those localities.

7. As cable system operators, Storer Cable provides basic cable services to subscribers for a monthly fee. These basic cable services include local broadcast chan-

nels, imported signals (distantly broadcasted television channels), and other programming.

8. Additionally, Storer Cable transmits certain premium programming services acquired by Storer in an encrypted form via coaxial cable to subscribers who are provided with the equipment necessary to receive and decode the transmissions for reception on the subscribers' television receivers. Storer Cable provides such premium programming at an additional charge to basic service subscribers who desire this programming.

9. The premium programming consists primarily of feature films and special entertainment events. Through various contractual agreements, Storer Cable has acquired the rights to provide such programming to its customers.

10. Storer Cable provides to its customers the equipment necessary to receive and decode the programming transmitted by Storer. Ownership of the cable equipment is retained by Storer Cable, which ensures that the equipment they provide is maintained in good working condition. Customers pay Storer Cable an installation charge, a nominal monthly charge for the equipment and a monthly charge for the programming.

11. Storer Cable maintains a staff of service personnel that performs equipment maintenance and provides service to its customers at no additional charge. Storer Cable also has undertaken an extensive and costly advertising campaign to promote its cable television systems in Dade and Broward Counties.

12. Storer Cable provides subscribers with services different from those provided by "free" standard television broadcasting. The cable transmissions are intended for use only by plaintiffs' customers and are not transmitted for the benefit of or use by the general public.

13. Defendants have been engaged in the advertisement, offer for sale, sale, provision of instructions for installation and actual installation of one or more types of cable television equipment. Testimony was heard clearly establishing that McDonough is employed by Mogel for the purpose of installing the equipment sold by Mogel from his home and from a booth at the Thunderbird Swap Shop in Broward County. These sales and installations were made on a cash-only basis and spanned over a one-year period. Such equipment is used and intended to intercept and receive Storer Cable's transmissions of programming and to decode those transmissions for reception on a standard television receiver, all without consent or authorization of plaintiffs. The testimony concerning plaintiffs' investigation into defendants' activities revealed that defendants sell, provide instructions for installation and install basic converters and decoder boxes for premium programming, which when attached to the cable lines and equipment installed by Storer Cable, allow the reception of plaintiffs' cable television services, without payment being reported or made to plaintiffs. By sale and installation of this equipment, defendants enabled purchasers both with and without basic cable service to intercept plaintiffs' transmissions. Those purchasers who were not subscribers to plaintiffs' basic cable service, were enabled to receive and use both basic and premium programming services as a result of defendants' sale and installation of the equipment. Purchasers who were already receiving plaintiffs' basic cable service and who in fact may have been paying basic subscribers, were additionally enabled by defendants to receive the premium programming services transmitted by plaintiffs. In both situations, plaintiffs were deprived of compensation to which they were entitled for their services from defendants' customers.

14. The Court finds that defendants provide this equipment with the specific knowledge and intent that said equipment can and will be used to receive plaintiffs' transmissions without the purchasers subscribing to and paying for the services, thereby evading compensation to Storer Cable for the reception and use of its cable television services. Testimony was heard that on nine separate occasions, plaintiffs'

investigator met or spoke with Mogel regarding the purchase and installation of one or more converters and decoders, and at no time did Mogel advise the investigator to contact plaintiffs or any other cable company to report the services for payment. To the contrary, it was always made clear by defendants that the purpose of purchasing their cable equipment was to enable the purchaser to avoid payment for the cable services received. On two separate occasions, McDonough installed equipment sold by Mogel to plaintiffs' investigator and on each occasion McDonough acknowledged that what they were doing was illegal. McDonough also advised his customers on ways to ensure that the cable operator did not discover the unauthorized reception of cable services.

15. Evidence at trial established defendants receive a flat fee, between $150 and $250 in cash, for such equipment and/or installation and deprive plaintiffs of the subscription fees for their cable television services.

16. Defendants' purpose and intent in selling, providing instructions for installing and installing cable television equipment, is to secure a private financial gain for commercial purposes by assisting, aiding and abetting the purchasers of such equipment to appropriate plaintiffs' transmissions while avoiding compensation to Storer Cable.

17. Defendants' activities are done without the permission of plaintiffs. No part of the proceeds received from the sale of the cable television equipment has been paid to Storer Cable, which has neither authorized nor entitled any persons to receive or to intercept its transmissions of programming without payment therefor.

18. The persons to whom defendants have sold cable television equipment would otherwise be able to secure Storer Cable's cable television services only by contractual arrangement with Storer Cable, and would therefore likely become paying customers of Storer Cable's cable television services but for defendants' unauthorized sale and installation of said equipment.

19. Defendants' conduct causes substantial damage to plaintiffs. The monthly charge paid by Storer Cable's customers for the basic and premium programming is the primary source of revenue for Storer Cable.

## CONCLUSIONS OF LAW

### SECTION 553 OF THE FEDERAL COMMUNICATIONS ACT

1. Section 553(a)(1)[1] of the federal Cable Communications Policy Act of 1984, 47 U.S.C. § 553(a)(1), effective December 29, 1984, prohibits any person from intercepting, receiving or assisting in the interception or reception of any communications service offered over a cable system unless specifically authorized to do so by a cable operator. 47 U.S.C. § 553(a)(2) provides that the phrase "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1). The Act empowers this Court to entertain a civil action by anyone aggrieved by a violation of § 553(a)(1) and to grant preliminary injunctive relief.

2. Plaintiffs allege that defendants' actions violate Section 553 of the federal Communications Act in that:

(a) Defendants willfully intercept, receive or assist in intercepting and receiving the communications services of Storer Cable, cable operators, without authorization; and

(b) Defendants willfully distribute, sell, provide instructions for installing and install equipment intended for unauthorized reception of a communications service of-

---

**1.** Section 553 was originally enacted as Section 634 and the legislative history of the Cable Communications Act refers to it as such. Section 634 was redesignated as Section 633 and was subsequently recodified in United States Code Annotated as Section 553.

fered by cable systems for commercial advantage and private financial gain.

3. Although there is no decisional law under this new statute, it is apparent that Congressional intent was to prohibit theft of cable service. According to the House report:

Theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee [on Energy and Commerce] believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it.

H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4720. The legislative history further states that "paragraph (a)(2) is primarily aimed at preventing the ... distribution of so-called black boxes and other unauthorized converters which permit reception of cable service without paying for the service." H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 84, *reprinted in* 1984 U.S. Code Cong. & Ad.News 4655, 4721.

4. Congress intended that the phrase "any communications service" contained in Section 553(a)(1) include "audio, video, textual, data or other service offered over a cable system, including any material transmitted to or from any subscriber over a cable system that has interactive capability." H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4720. Thus, this Court finds that plaintiffs' services are the type of services sought to be protected by the new statute.

5. This Court finds that defendants' sale, provision of instructions for installation and actual installation of cable television equipment, with the specific knowledge and intent that such equipment would be used, and in fact was used to intercept plaintiffs' services without payment therefor, is precisely the type of conduct that

Congress sought to proscribe when it enacted Section 553.

6. Defendants' unauthorized provision of instructions for installation and actual installation of the cable television equipment used to intercept plaintiffs' services, is clearly conduct which "assists in receiving or intercepting" plaintiffs' protected transmissions in violation of Section 553. No intent or specific knowledge is required under § 553 for this type of activity. The conduct herein done demonstrates a violation of the Act. Nonetheless, the Court finds that defendants acted with the intent and specific knowledge that their customers would avoid payment to plaintiffs for their services.

7. As to defendants' sales of such equipment, the finding of intent and specific knowledge is more significant. The legislative history of § 553 states that if "a distributor intends that equipment he distributes ... be used for interception or reception of services provided over a cable system, such person should be liable for assisting such activities." H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 83–84, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4655, 4720–21. Thus, when distributors of cable television equipment "provide the equipment with the intent or specific knowledge that it will be used for the unauthorized reception of cable service, they are liable under the act." H.R.Rep. No. 98–934, 98th Cong., 2d Sess. 84, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4721.

8. This Court finds that such specific knowledge or intent is apparent under the facts of this case. Defendants' conduct herein clearly demonstrates that when they sold the cable television equipment, they had the requisite knowledge or intent that their customers would not contact plaintiffs to arrange for payment for their programming services. This intent is demonstrated by providing instructions for installing and actually installing the equipment and advising customers not to contact their local cable companies for payment for the services. Testimony was heard that

McDonough specifically stated that what he and Mogel were doing was illegal. In fact, this Court finds that defendants' entire business of distribution, sale and installation of cable converters and decoders has been structured around this very premise.

9. Decisional support for finding violations under Section 553 is found in a long series of federal pay-television theft of service cases in which the provider of the service has sued distributors of equipment under similar federal and state theft of service laws. Prior to the enactment of Section 553, the federal statute which proscribed theft of over-the-air pay television services was Section 605 of the federal Communications Act of 1934. Section 705 of the Cable Communications Policy Act of 1984 redesignated former Section 605 as Section 705(a), effective December 29, 1984, and added, *inter alia*, the remedies set forth in § 705(d). In relevant part, Section 705(a) provides:

> No person not being authorized by the sender shall intercept any radio communications and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (1984).

10. Several federal appellate courts have had no difficulty in concluding that the unauthorized sale and installation of pay-TV equipment for the interception of over-the-air transmissions violates Section 605 even though, as distinguished from Section 553, there is no specific prohibition. *See, e.g., ON/TV of Chicago v. Julien*, 763 F.2d 839 (7th Cir.1985); *California Satellite Systems v. Seimon*, 767 F.2d 1364 (9th Cir.1985); *National Subscription Television v. S & H TV*, 644 F.2d 820 (9th Cir.1981); *Chartwell Communications Group v. Westbrook*, 637 F.2d 459 (6th Cir.1980). In addition, federal and state courts have uniformly held that the unauthorized sale and installation of devices to intercept and receive over-the-air pay television transmissions is a clear violation of various federal and state laws. *See, e.g., Subscription Television of Greater Washington v. Kaufmann*, 606 F.Supp. 1540 (D.C.D.C.1985); *Ciminelli v. Cablevision*, 583 F.Supp. 158 (E.D.N.Y.1984); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376 (N.D.Ohio 1983); *U.S. v. Stone*, 546 F.Supp. 234 (S.D.Tex.1982); *American Television, etc. v. Western Techtronics*, 529 F.Supp. 617 (D.Colo.1981); *Home Box Office, Inc. v. Advanced Consumer Technology, et al.*, 549 F.Supp. 14 (S.D.N.Y. 1981); *U.S. v. Westbrook*, 502 F.Supp. 588 (E.D.Mich.1980); *American Television and Communications Corp. v. Pirate T.V., Inc., et al.*, Case No. 81–969 (S.D.Fla. 1981).

11. The Court finds the decisions in *Cox Cable Cleveland Area, Inc.* and *Ciminelli* to be persuasive. In *Cox Cable Cleveland Area, Inc. v. King, supra*, plaintiff, an operator of a cable television system, obtained preliminary injunctive relief under Section 605 to prevent defendant's continued sale, installation and use of cable television equipment to illegally intercept plaintiff's transmissions. The court held that defendant's advertisement, offer for sale, installation and use of devices, consisting of converters, decoders and descramblers, capable of, used for and intended to be used for unauthorized interception of and reception of plaintiff's cable transmissions, violated § 605. The court further stated that:

> defendant's activities in selling [and installing] decoders to purchasers who use them for viewing plaintiff's signals constitutes a prohibited divulgement or publication within the meaning of § 605 ... [and] assist third parties in receiving communications to which they are not entitled.

582 F.Supp. at 380.

12. Similarly, in *Ciminelli v. Cablevision, supra*, the court held that sales of

decoders and descramblers, capable of receiving cable television transmissions, and made for the purpose of assisting the unauthorized reception of such wire communications, constitute a prohibited divulgement or publication within the meaning of Section 605. The Court further stated that the "act of viewing a program on a television set equipped with an unauthorized decoder amounts to disclosure of the existence, contents, substance, purport, effect, or meaning of ... signals to nonsubscribers." 583 F.Supp. at 164. The court further stated that:

> In addition, defendants' acts assist others in receiving interstate radio communications, premium services, they're not entitled to. Since this is done for the benefit of defendants and for the benefit of the purchaser as well, it too violates Section 605.

*Id.*

■ 13. Thus, this Court concludes that based on the evidence presented, defendants herein, by such unauthorized sale, provision of instructions for installation, and actual installation of converters, decoders or other cable television equipment, coupled with the specific knowledge or intent that such equipment be used to intercept plaintiffs' services without payment therefor, "assist in receiving" plaintiffs' protected transmissions, in violation of Section 553. The Court further concludes that defendants' defense that only the use of such equipment is illegal, rather than its sale or distribution, is totally without merit.

## FLORIDA STATUTES SECTION 812.14: TRESPASS AND LARCENY OF CABLE TELEVISION SERVICE

14. Section 812.14, Florida Statutes, makes it unlawful to:

(a) willfully alter or tamper with equipment belonging to a cable television service so as to cause loss or damage;

(b) make or cause to be made any connection in such a manner as to use, without the consent of the cable television service, any service, or to cause to be supplied any service from a cable television service without such service being reported for payment; and

(c) use or receive the direct benefit from the use of cable television service knowing, or under such circumstances as would induce a reasonable person to believe, that such direct benefits have resulted from any tampering with, altering of or injury to equipment owned, operated or controlled by a cable television service, for the purpose of avoiding payment.

15. There is also very little decisional law under this statute, except the Florida Supreme Court's decision in *State v. Petruzzelli,* 374 So.2d 13 (Fla.1979), where the court stated that the intent of the legislature under this statute was to prohibit larceny of a service or trespass to the fixtures of a supplier thereof.

16. Recently, though, several circuit courts in Dade and Broward Counties, Florida, have granted preliminary and permanent injunctions under similar facts as herein on the basis of Section 812.14, Florida Statutes. *See Storer Cable Communications, Inc. v. Seidner,* No. 83–12087(22) (April 25, 1983); *Storer Cable Communications, Inc. v. Haselton,* No. 83–07075 CL (October 25, 1984); *Storer Cable Communications, Inc. v. Rodriguez,* No. 18572(25) (March 21, 1984). In *Storer Cable Communications, Inc. v. Seidner, supra,* plaintiffs sought preliminary injunctive relief to prevent the continued unauthorized sale, installation and use of cable television equipment. The court found that the defendant knowingly sold and installed such equipment with the representation to prospective purchasers and intent that the equipment was capable of and would be used to receive plaintiffs' transmissions, without the purchasers reporting and paying for the services. In its Final Judgment for Permanent Injunction and Damages, the court held that a sale of such equipment violates Section 812.14, Florida Statutes:

> A sale of such equipment 'cause[s] to be supplied' plaintiffs' service and such ser-

vice has not been reported for payment by any purchaser thereof ...

17. This Court concludes that Florida Statutes, Section 812.14 applies not only to the purchasers and users of such equipment who fail to report for payment reception of the programming services to cable companies, but also to the providers and installers of such equipment. The testimony established that on two separate occasions, McDonough actually made the necessary physical connections between defendants' equipment and Storer Cable's cable wires, in order to enable defendants' purchasers to receive plaintiffs' cable services. Based on the testimony heard, defendants have violated Section 812.14, Florida Statutes, by selling, providing instructions for installing and actually installing cable television equipment, with the knowledge and intent that it would be used to intercept and receive plaintiffs' cable television services, thereby:

(a) making or causing to be made connection with plaintiffs' equipment in such a manner as to directly cause the use of plaintiffs' cable television services without plaintiffs' consent; and

(b) causing plaintiffs' cable television services to be supplied without such services being reported for payment; and

(c) assisting, aiding and abetting third parties to use plaintiffs' cable television services without plaintiffs' consent and without such services being reported for payment; and

(d) willfully altering or tampering with the cable and other apparatus or devices belonging to plaintiffs in such a manner as to cause loss or damage to plaintiffs; and

(e) making connection with plaintiffs' equipment in such a manner as to directly cause the use of plaintiffs' cable television services without plaintiffs' consent.

### FLORIDA STATUTES SECTION 812.014(1): THEFT AND CONVERSION

18. Although no argument was heard at the hearing concerning this statute, its applicability was fully briefed by plaintiffs and merits resolution herein.

19. Section 812.014(1), Florida Statutes, prohibits any person from knowingly obtaining, using or endeavoring to obtain or to use the property of another with intent to: (a) deprive the other person of a right to the property or a benefit therefrom; or (b) appropriate the property to his own use or to the use of any person not entitled thereto.

20. Plaintiffs allege that defendants have violated Section 812.014(1), Florida Statutes, by intentionally, knowingly, willfully and wantonly selling, installing and using cable television equipment to intercept, obtain and use plaintiffs' cable television services, without plaintiffs' authorization or consent.

21. The property right which has been taken includes plaintiffs' programming, exhibition and distribution rights via coaxial cables in certain areas within Dade and Broward Counties. Additionally, plaintiffs' cable television services are "property" within the meaning of Section 812.014, Florida Statutes.

22. In *Storer v. Seidner, supra,* the court granted permanent injunctive relief and held that defendant's activities in selling, installing and using unauthorized cable television equipment violated Section 812.-014(1), Florida Statutes, stating:

Defendant's activities also violate Section 812.014(1), Florida Statutes. This theft statute prohibits any person from knowingly obtaining, using, or endeavoring to obtain or to use, the property of another.... "Property" includes the private communication services which plaintiffs supply. *See Fla.Stat.* § 812.-012(5).

Defendant has violated Section 812.-014(1) by selling, installing, and using equipment which intercepts and receives plaintiffs' cable television service. By defendant's actions, plaintiffs are deprived of their property and defendant appropriates plaintiffs' property in the form of exhibition and distribution rights

to programming, rights to collect fees therefor, and plaintiffs' cable television service.

*Id.*, slip op. at 7.

■ 23. This Court concludes that based on the evidence presented, defendants have violated Section 812.014(1), Florida Statutes, by intentionally and knowingly selling, providing instructions for installing, actually installing and using cable television equipment to intercept, obtain and use plaintiffs' cable television services, without plaintiffs' authorization or consent.

## INJUNCTIVE RELIEF

24. Under 47 U.S.C. § 553(c)(2)(A), this court is specifically empowered to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1)." *See also* Section 812.014, Florida Statutes.

25. In order to obtain a preliminary injunction, the movant must generally establish: (1) the likelihood of plaintiff's ultimate success on the merits; (2) irreparable injury to the plaintiffs in the event the interim relief is denied; (3) irreparable injury to other parties in the event such relief is granted; and (4) the public interest. *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Company*, 621 F.2d 683 (5th Cir.1980). Under 47 U.S.C. § 553, a movant need only prove a violation of § 553(a)(1) in order to request an injunction under § 553(c)(2)(A).

■ 26. As discussed previously, plaintiffs have proven a likelihood of success on the merits under 47 U.S.C. § 553, and Sections 812.14 and 812.014, Florida Statutes. As a result, it is not necessary to reach the remaining claims asserted by plaintiffs.

27. Plaintiffs have also met their burden of proving that they are irreparably injured by defendants' conduct. It should be noted that several courts have held that absence of justification for violation of clear statutory rights virtually eliminates the necessity of showing irreparable harm.

*See Home Box Office, Inc. v. Pay TV of Greater N.Y.*, 467 F.Supp. 525 (E.D.N.Y. 1979). In *Home Box Office, Inc., supra* at 529, the court stated:

> where, as here, a defendant shows no justification for continuing to violate a plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of "irreparable" damage as would be required where plaintiff's ultimate success was more doubtful....

*See also American Television and Communications Corp., v. Pirate T.V., Inc.*, Case No. 81–969–Civ–EBD (S.D.Fla.1981) ("In the area of Section 605 violations a certain laxness has been recognized in evaluating the movant's proof of irreparable harm.").

28. Defendants' conduct causes irreparable injury because plaintiffs' ability to retain existing subscribers, to enlist new subscribers, to acquire suitable programming and to remain in the cable business depends directly on their reputation as the sole source of the cable programming that plaintiffs provide. As the court noted in *Cox Cable Cleveland Area, Inc.*, "if equipment necessary to receive, convert and decode [plaintiffs'] scrambled signals can be purchased from defendants without payment to [plaintiffs], the public will no longer see any advantage in paying [plaintiffs] to obtain premium programs." 582 F.Supp. at 381. Additionally, in *Subscription TV of Greater Washington*, the court aptly stated that, "plaintiffs' ... business will not survive if plaintiffs lose their credibility as the exclusive source of their programming." 606 F.Supp. at 1546. Thus plaintiffs have clearly shown that they have, and will continue to, suffer irreparable injury, in absence of the granting of the requested relief.

29. The irreparable nature of the damage to plaintiffs clearly indicates that the threatened injury, to plaintiffs outweighs that injury which an injunction may cause to the defendants. The testimony and other evidence has established that defendants have engaged in surreptitious and secretive

behavior, and that they possess approximately 1000 cable converters and decoders, some of which may have been stolen from the inventories of several local cable operators. Defendants' past conduct and the likelihood of their engaging in similar unlawful conduct in the future without intervention by this Court, clearly demonstrates that the risk of denial of injunctive relief is too great, and is substantially outweighed by the irreparable harm it would cause plaintiffs.

30. The alleged illegal activities of the defendants are not worthy of any protection by this Court. Even if defendants' primary business is the distribution, sale and installation of equipment for unlawfully intercepting plaintiffs' cable television programming, and even if defendants would be deprived of substantially all of their revenue if they are enjoined, the defendants have no vested right to earn money by violating the law. Defendants will suffer no harm if an injunction is issued which simply requires them to obey the law. *See Cox Cable Cleveland Area, Inc.,* 582 F.Supp. at 381; and *Home Box Office, Inc.,* 467 F.Supp. at 529.

31. The final factor needed to be established for this Court to grant a preliminary injunction is likewise demonstrated. To enforce an act of Congress is hardly contrary or adverse to the public interest. 47 U.S.C. § 553 promotes express Congressional policy to proscribe theft of cable television services and injunctive relief is declared appropriate under the statute to restrain violations of the Act. 47 U.S.C. § 553(c)(2)(A).

32. Also, the municipalities and localities which have granted to plaintiffs franchises to provide cable television services have a public interest in protecting their right to franchise such services. Not only will an injunction protect a source of revenue for these municipalities and localities, but it will also ensure the quality and availability of services that the franchise agreements are intended to secure. *See Cox Cable Cleveland Area, Inc.,* 582 F.Supp. at 381.

33. Additionally, individual members of the public, namely those subscribers to plaintiffs' services who obey the law and do not utilize defendants' equipment to unlawfully intercept plaintiffs' signals, have an interest in seeing that the subscriber base does not shrink and that they are not, consequently, forced to bear a disproportionate share of the costs of maintaining the local cable television systems. The legislative history of Section 553 of the federal Communications Act provides that:

> theft of cable service ... creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it.

H.R.Rep. No. 934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4655, 4720.

34. Finally, ruination of plaintiffs' businesses is adverse to the public's interest, as it threatens the availability of pay cable television to thousands who pay for and desire the services. As the court stated in *National Subscription Television v. S & H TV:*

> Appellees' activities threaten the economic activity of the STV industry, and thus run counter to ... the public interest. Specifically, the inability of STV operations to control public viewing of their signals reduces their income, which in turn prevents them from obtaining attractive programs on their systems and discourages the investment of capital in STV enterprises.

644 F.2d at 825.

35. Plaintiffs have requested that this Court issue a preliminary injunction to prevent the destruction, transfer or concealment of defendants' records, including customer lists, sales receipts, invoices and other documents and defendants' unauthorized cable television equipment. These records and equipment will be appropriate and necessary for this Court to render a meaningful final decision on the merits. Injunctive relief is, therefore, appropriate to prevent the destruction, transfer or concealment of such books, records and equipment. *See*

*Meis v. Sanitas Service Corp.,* 511 F.2d 655 (5th Cir.1975); *Zuckerman v. Professional Writers of Florida,* 398 So.2d 870 (Fla. 4th DCA 1981).

Accordingly, it is hereby ORDERED and ADJUDGED that:

1. Plaintiffs' Motion for Preliminary Injunction against defendants, Ron Mogel and Robert E. McDonough, is hereby GRANTED.

2. The defendants, Ron Mogel and Robert E. McDonough, and their partners, officers, agents, representatives, servants, employees, attorneys, privies and all persons in active concert or participation with them are enjoined, during the pendency of this action from:

(a) intercepting, receiving or using plaintiffs' communications or cable television services without authorization from plaintiffs;

(b) assisting, aiding, abetting or conspiring with any person to intercept, receive or use plaintiffs' communications or cable television services without authorization from plaintiffs;

(c) manufacturing, assembling, providing instructions for installing, installing, possessing, using, selling, giving or otherwise displaying, promoting, soliciting customers, distributing, leasing, marketing, furnishing, advertising or offering for sale or installation any device or plans or parts of any device designed, adapted, used, capable of, intended to be used or represented as capable of use, to intercept and receive plaintiffs' cable television services;

(d) destroying, transferring or concealing any records, customer lists, sales receipts, documents, memoranda, purchase orders, invoices, bank records, books or ledgers, diagrams, advertisements or equipment used in or pertaining to the purchase, sale, lease, design, installation or advertisement or other use or application of unauthorized cable television equipment; and

(e) disposing of, concealing or removing from this jurisdiction proceeds from any sale or installation of any unautho-rized cable television equipment described herein.

3. The Defendants, Ron Mogel and Robert E. McDonough, shall provide to plaintiffs all customer lists, receipts, purchase orders and other information concerning the identity and whereabouts of any purchasers of unauthorized cable television equipment of which defendants have knowledge, within 20 days from the date of this Order.

4. The plaintiffs shall post adequate security bond in the amount of $25,000.00 in accordance with Rule 65(c), Federal Rules of Civil Procedure.